Since Judge Fischer and Judge Smith are in the courtroom, I wonder if Judge Fischer would be kind enough to preside in court. I'll be glad to do that. We only have the one case on calendar, so you each know your time limits. They're shown on the clock. If the petitioner wants to reserve some time, do you plan to? Keep your eye on the clock, then. We will begin. There will be a bit of a lag, as you can tell. I don't know, do you have a monitor so you can see Judge Kleinfeld, correct? I would ask that it be turned up a little bit. Can we get the volume up a bit? Sure. And then sort of keep your eye on it a little bit, because if Judge Kleinfeld wants to ask a question, there may be a break. That's the one disadvantage of telecommunications. It's my first time at the video teleconference. May it please the Court, Gerald Brannan on behalf of Victor Carrasco. Now, the Court knows that Mr. Carrasco raised an IAC claim, and that's based on the fact that he claims that his attorney failed to conduct a thorough investigation of his case and also abandoned him. And then he also claims that the what I want to focus on today is the fact that the State court's opinion decision regarding the IAC claim is both contrary to and a misapplication of Strickland as well as- Do you have any authority more specific than Strickland? Excuse me? Do you have authority more specific to the situation than Strickland? I was thinking particularly of Hill versus Lockhart. Well, yes, as a matter of fact, there's Reynoso versus Gravino, and there's a lot of cases that suggest that explore and develop exculpatory evidence. You said a lot of cases, and remember 2254D only lets us use Supreme Court cases under the recent Supreme Court decision. We have other Supreme Court decisions besides Hill. Well, I think Strickland is sufficient in this case as the guidepost for us to evaluate whether the State court decision was either contrary or a misapplication of Strickland and also based on an unreasonable determination of the facts. Counsel, I'd like to have you focus for just a second, if I may, on the second prong of Strickland. If for purposes of our discussion we say that Reynoso raises issues with respect to the investigation, I'm concerned about the prejudice prong. As I've read the record in this case, it seems very clear that this defendant has had a lot of experience in dealing with the criminal court system. And I'm looking specifically at page 24 of the appellate's excerpts of record, volume 3, trial court proceedings transcript. In that case, the State indicated that he said you were in the courtroom 1, 2, 3, 4, 5, 6, 7 times before then on various other cases. Is that right? And your client said, that's right. Did you have an attorney in those other cases? Yes, I did. Did you talk to the attorneys about the facts of those cases before you pled guilty to those offenses? No, I didn't. Never talked to a lawyer? No, not one. In 1987, I spoke to my innocence on that case, too. But you pled guilty to it, was the question. I pled guilty to it for the sake of the outcome. Question, to take advantage of the plea bargain. Answer, to take advantage. When you were charged with murder, you took advantage of the plea bargain to take advantage of the lesser plea to manslaughter. Is that right? Answer, because that's what my counsel advised me to do. Question, that would cut your liability or your exposure for the amount of time you were going to do right. Answer, exactly. What I'm concerned about here, counsel, is your client obviously knows the game, if you know what I mean in this sense. It's true that Mr. Daley didn't interview some people, but how in was your client prejudiced here? He made a decision of going from what was clearly an indeterminate sentence potentially if he lost the trial to one where he got 17 years. He bargained for that, if you will. He had time to consider it. According to the record, there was like two hours, two and a half hours before he ultimately went out and pled when he was not with the other defendants. How do you respond to that? Well, Your Honor, I think that he, in this case, he was misadvised. He was misadvised, and I think his plea was involuntary. Why it's important is throughout all the proceedings here, he was screaming, I'm innocent. He was screaming, I'm innocent, I want to go to trial, and he kept telling his lawyer that. He was convinced of that. He was uncertain up to the just before he pled, he wasn't certain about whether he was going to plead. Now, under those circumstances, how could the attorney not interview one of the eight additional witnesses to the offense? There were eight additional witnesses, I'm sure. He said to his lawyer, I'm innocent. I tried to break the fight up. He was consistent throughout the whole process in claiming his innocence. Counsel, can they hear me? Yes, I can. Counsel, is there an affidavit showing that these fellow prisoners and the ones who were in the fight were available to the lawyer for an interview and that their names were given? The ones in the fight, of course, the lawyer could find out about. The various other friends of Carrasco, I don't know if he could or not. Is there evidence that the lawyer knew about them or was told their names and also that they would talk to him? Well, it's hard for me to imagine that a lawyer who took the time to go up and visit the crime scene, the prison yard, would not have also wanted to know who else was in the yard at the time. Counsel, you evaded my question here. I didn't ask about your imagination. I asked about the evidence in the record. It looked to me as though the affidavits were somewhat artfully worded, but I might have missed some affidavits. And I want to know what is there to show. Gee, if he'd only interviewed me, I would have said such and such. And then under Hill v. Lockhart, the Supreme Court says the defendant must show there is a reasonable probability that but for counsel's errors he would not have pleaded guilty and would have insisted on going to trial. So I also need your reference to the excerpts where it shows that had his lawyer tried to interview these witnesses, they would have talked, Carrasco would not have pleaded guilty and would have insisted on going to trial. I think Carrasco says that, and, you know, I don't have that sight at the tip of my fingers, but I would be happy to supply it to the court afterwards. As far as the witnesses saying that they were never contacted by counsel, Carrillo and Calabella, I think, are the two witnesses that supply declarations after the fact that indicated that, you know, they were never contacted by counsel. In addition, the habeas lawyer. That didn't mean anything to me because when I used to go over to the prison to interview clients, there are lots of prisoners there, maybe a couple hundred, 300 prisoners in our little local prison. And how do I know who to talk to unless my client tells me? Well, I'm sure that Carrasco was able to tell him who was in the yard at the time. But did Carrasco tell him? I would assume that if Carrasco is telling his lawyer that he's innocent, that he was trying to break the fight up and he wasn't assaulting anybody, and the lawyer might have said, well, who am I? The reason I need something from the record rather than assumptions and imagination is I, frankly, cannot imagine telling a client, take a chance on 30 to life. You've got some fellow prisoners, so give good testimony when you can get 17, ceiling. Would you do that without investigating eight potential exculpatory witnesses? There was an investigation by the prison officials, correct, of this fight? I mean, this all went down. It was videotaped, was it not? Well, the videotape was entirely unintelligible. My point is, though, that there was, in fact, evidence of the fight for the lawyer to look at. He knew where the fight occurred. He knew. Absolutely. So did he interview the victim? That, in fact. Did he interview the victim? No. Was there a declaration from the victim that exonerated him? Yes, there was. That's what's so interesting about this case. Five people submitted declarations attesting to Carrasco's innocence. The victim, Mota, the victim Mesa, the one of the primary people who assaulted him, the two people that were specifically identified as the assailants, Mota and Lucero. So Mesa provided a declaration. Mota provided a declaration. And who identified Mota? How were they identified? Barnhart did. He only identified, he only could recollect two people. So the facts are that the lawyer knew who the assailants were because they were identified by the state. It was part of the claim, wasn't it? Part of the charge. The tape would have identified. They were co-defendants. Right. And also the other people in the yard were presumably on the tape. I mean, the lawyer had access to all this stuff and knew they were. So were some of the people who would exonerate him his co-defendants? I'm sorry? Were some of the people who would exonerate him the co-defendants? The co-defendant? Yeah. A hallman. Yeah. He would not testify in favor of Carrasco, presumably. Well, I think he would. I think he would have. Well, do we have an affidavit from him? Well, we do have an affidavit from him that says some very interesting things about the nature of the negotiations that went on. I'm not interested in the negotiations. The issue right now is your claim that if he had simply talked to people readily identifiable, he would have received more than one statement that Carrasco was trying to break up the fight, that part of the fight. Correct. That's your point, isn't it? That's my point. Thank you. That's my point. Do you have evidence that they would have testified? I mean, it sounds to me as though a co-defendant would have to subject himself to cross-examination, where he has to say, yeah, I was slashing the guy with the razor blade, but Carrasco wasn't, and there goes his defense. Well, actually, Moda's declaration says exactly that, Your Honor. That's after the fact. That's after the fact, when he's protected by double jeopardy, he has no further risk. Oh, no. He actually wanted to show up at the change of plea hearing and say, you know, Carrasco was not involved in this. He was trying to break it up. He was trying to pull me off. And they wouldn't let him because his plea in an unrelated case was contingent on him not testifying at the change of plea hearing. So the prosecutor made his deal in the unrelated case contingent upon his not being able to testify. He was not able to testify to that. His declaration says exactly what you suggested. What you just raised is an interesting and serious issue, but it's different from ineffective assistance by Carrasco's lawyer. It's more in the nature of prosecutorial misconduct. Because you asked me if I was aware of a declaration by one of the assailants or co-defendants that indicated that Carrasco was trying to break the fight up. Well, doesn't that also further undermine the concept that these people were going to testify and exculpate your client? This is one instance where clearly he was not in a position to testify because of the deal that had been made. I think Judge Kleinfeld raised the question earlier. Is there any affidavit, any declaration from any of these other people that they would have been willing to testify, would not have raised the Fifth Amendment, that their lawyers had agreed, all that sort of thing? I know some said they would testify, but they didn't say they wouldn't raise the Fifth Amendment, did they? No. Some, yes. That's entirely possible that their counsel at the time would have said, you know, look, I really don't want you to testify because even though this issue has cleared up, they may charge you with something else. You really can't say anything. Except for the fact that there was five exculpatory declarations, one from MoDA and one from MESA, two people who might have taken the Fifth because they were involved in the offense or other offenses. But then there was three declarations submitted by bystanders who were standing by who did not participate at all, who said, yeah, you know, he was trying to break it up. Okay. I think you've gone over your time, so why don't we hear from the State. I would like to resume. And, well, you're over time, but I'll give you another minute. Thank you, Your Honor. For rebuttal. Good morning, Your Honors. May it please the Court. Anthony DeSilva, Deputy Attorney General, for the Respondent. In this case, there was testimony provided at the plea withdrawal hearing in October 2000 by Carrasco, by Codefendant Hallman, and also their attorneys, as well as the attorney for Bradley. After that evidentiary hearing, the trial court found that there was no good cause for the plea withdrawal. In other words, they did not show clear and convincing evidence. Those factual determinations and credibility determinations were affirmed by the State appellate court, also by the district court in the report and recommendation by Magistrate Judge Major and ultimately by District Court Judge Irma Gonzalez. And we believe that all of those factual determinations and credibility determinations are supported by the record, Your Honor. Has there been a credibility determination on the investigation aspect? I'm not sure. Affects any of that? I'm not sure. Let me just see if I can make the question clear. What troubles me is that we have Supreme Court law, albeit in capital cases, but it's been implemented in this circuit in non-capital cases where a lawyer has a duty to investigate. And there is no question here that there was a fight. And the question is, and not resolved by the video apparently, whether Roscoe was in there as a good Samaritan, if you will, or an assailant. And he's saying throughout, I was there trying to break up the fight. And the evidence comes forward after his plea that there were two participants and three bystanders who verified that he was there not as an assailant. Now, his counsel didn't interview any of them. So we don't know what they would have done. There's nothing to say that they would have invoked the Fifth or not because it's all hypothetical. We do know with the one because it's part of the claim, the victim. But the problem is that we're all in a hypothetical situation now. And so I'm trying to understand, what is the record we're looking at? What are the findings by the State court or even by the district court here that we're bound by? Well, I think what we have, especially the factual scenario, Your Honor, is we have nine inmates entering the exercise yard of which Mesa is the last one. Then Mesa is engulfed by Mota Lucero Carrasco-Hallman, the officer, Officer Barnhart, who's the yard observation officer, sees striking motions going on, perceives a fight, and starts yelling, get down, stop fighting. I believe in prison when you are ordered to do something, you are to do that. Well, that's fine, but that's just begging the question. My question is he's got a different perspective. He's in the middle of this melee. He's not denying that. The question is, what was he doing? His, as it is now, his attorney didn't present any option for anything other than what you're presenting to us. That's true. But that's the problem, isn't it? That's the very core of the issue. Why isn't the attorney plainly at fault for not doing a simple investigation? There's no question of who those nine were. There was no difficulty in finding their names, their numbers, whether they would talk to him, whether they appeared credible, whether they would, in fact, be good witnesses, whether or not they would be available witnesses. But he didn't do any of that. Your Honor, what I believe we can see from the record is that he did have discussions with Carrasco, that he viewed the videotape with Carrasco, that they discussed the issues and possible defenses, given that evidence. And Carrasco had already proclaimed that he was innocent. And so that's Carrasco. Well, that doesn't comply with Reynoso, did he? I'm sorry, Your Honor? Daly did not fulfill a requirement of Reynoso. Judge Fischer just detailed that whole thing. I mean, you maybe have a second prong issue, but isn't it clear that Mr. Daly did not fulfill the requirements of at least Ninth Circuit law in terms of his obligation to investigate? It appears. There's nothing on the record that shows that he spoke to his witnesses. Well, and he says in his own, you know, at the plea withdrawal hearing, he said he didn't do that. Yes, Your Honor. So there's no question about it. Yes. So, but on the other hand, we get to the second prong of Strickland, which your counterpart I don't think answered. And that is how in was the defendant prejudiced in this case? I'm troubled on the other side of this equation. You've got all these people, some of whom were not involved in the fight. We don't know what they would have said. It's entirely possible that they might have said, well, it's real clear to us that Carrasco was just trying to break this thing up. He was innocent. And yet the attorney did not even talk to them. They don't know what he could have done. What's the state's response to that? Well, Your Honor, the record doesn't really show what he did or didn't do with his witnesses. And we believe at this point that he didn't interview them. But short of that, he did go out to the yard. He did get the perspective that the yard was smaller, making Barnhart's testimony a little bit more credible. If you go to an accident scene, and what is the first thing that the police do? They look for witnesses, don't they? If you go to an officer-involved shooting, you aren't just going to take the testimony of the officers. You're going to look around, are you not? I hope, after all of the problems we've had with excessive force suits, that the regime is to go out and look for witnesses who will counteract or confirm the law enforcement officer's account of why the guy was shot and grievously wounded or killed. So what is so difficult in this case for the lawyer not to have talked to any of the people who were on the ground closer than the observing officer to say yea or nay? At the end of the day, the guy's got to decide whether to plead on the facts that his attorney has made available. And there's no corroborating witness to back up his testimony. So doesn't that affect whether he decides to plead or not? I think it could affect that, Your Honor. But at the same time, they did speak to the clients. The attorneys were all there. They probably heard their version and whatever information that their own clients may have provided them, in addition to the investigation of the yard, viewing the videotape, discussing the videotape with their clients. So your view is that perhaps the other defendants were incriminating Carrasco and, therefore, Daley knew it was a futile effort? It's possible. The only thing we know is that Daley testifies that it was his opinion that Carrasco was involved, and it's why I believe he testified to that, the plea withdrawal motion. But more importantly, he felt that there was a substantial risk that if he went to trial, he could, in fact, be found guilty, and, therefore, he would get the third strike and the indeterminate term. I'm willing to grant that. I really am. I just don't understand how you can make an informed judgment about cost-benefit when you don't know whether you have corroborating witnesses. Maybe he could make that evaluation, decide, no, they were too risky, their cons, this guy, Carrasco's a heavy in the prison, maybe they're frightened enough to go into court and say anything they think will please them or whatever. There are all sorts of possibilities. I'm having a big problem getting over the hurdle as to why an attorney under Strickland and under the Supreme Court jurisprudence about duty to investigate gets away with not bothering to go check to see whether witnesses would exonerate his client, and they've got affidavits from five who profess to say that they would have. I'd be interested in your take on the aiding and abetting concept that was raised in the colloquy with your client at the plea withdrawal hearing. He testified, and I'm just going to shorthand this, that, well, let me just phrase this. So Mr. Bradley, who was the other attorney with the other client, talked to you about the law aiding and abetting and the responsibility that one, an aider and abetter, would have for the acts of other persons. Is that the law he talked about? Answer, yeah, I believe so, yes. So Mr. Bradley discussed with you the responsibility of all participants for an incident. That is what you were talking about, yes. Is it the position of the State that the defendant in this case, even if he were there, if you will, trying to break up the fight, could have been held liable as an aider and abetter in this stabbing and slicing? If he were there to break up the fight, Your Honor, I don't believe that he would be found to be an aider and abetter, but if he was part of the group that involved the case to allow this to occur, I think he would be found liable as an aider and abetter. So again, it gets back to the witnesses. He was falsely advised then by Mr. Bradley, who is admittedly not his attorney, that he could have been found guilty as an aider and abetter if his witnesses had held up. Yet Officer Barnhart, whose testimony they had tested at the preliminary hearing, indicated that that is what happened, that they had engulfed Mesa and that he saw all of them with striking motions. And again, as we know, after Mesa is found bloodied, razors are found in the yard, and there was enough there for the assault with a deadly weapon charge. And there was a great risk had any of them gone to trial because I believe they were all eligible for a third strike. Counsel? Yes, sir. I noticed that in the State Court of Appeal decision that 2254D tells us to defer to, it says in Excerpts 47, page 34 of the decision that Mesa's statement after the fact, in support of Hallman's and Carrasco's petitions that they did not attack him, is simply not credible. The same may be said for the declarations of the other assailants and witnesses to the attack. Now, that finding of fact comes after some of the declarations. I am unclear, though, as to which declarations they're looking at and which declarations we can consider. As I recall, there are some declarations that we cannot consider because they were not submitted in the State Court evidentiary hearing and others that we can because they were. Could you just list what we can read here and what we have to defer to? Your Honor, I can't list exactly what we hear. Your Honor, I know some are listed in the State Court opinion, but clearly the declarations by Carrillo and Colabella that were submitted in September of 2003, they were submitted almost a year after the State Court decision had become final, and District Court Judge Gonzalez did not consider them. And I believe that those contain additional evidence that the District Court would not look at. They were never presented to the State Court. I believe there was also some of the medical records and other things that were not submitted to the State Court and were not part of the State Court record that were not considered by the District Court as well. Now, on this quote that I read to you from the State Court of Appeals decision, what is the standard for whether we have to follow that under the current 2254D law? I believe that any findings of fact that are made by the court are entitled to a presumption of correctness unless rebutted by clear and convincing evidence. And we don't believe that that clear and convincing evidence has been provided by the appellant in this case. So that would mean that we take it as a matter of fact that Mesa and the other assailants who filed declarations in the State Court were lying. Of course, I suppose Carrasco might win an acquittal on lies. As I recall, there was a Supreme Court decision on whether the possibility of winning an acquittal based on lies or a misunderstanding of law would establish prejudice. Do you happen to recall the name of the decision? I don't at the moment. I do not, Your Honor. I'm sorry. Not at this time, but I can look that up if the court would so like me to do so. We've got law clerks. I just thought you might know on the top of your head. Thank you, Your Honor. Unless this Court has any further questions. No, I think we're fine. Thank you very much. Do we have a brief rebuttal? Yes, thank you, Your Honor. I'd like to respond specifically to the three things raised. You raised the issue of prejudice. An attorney's performance can be so egregious that it could satisfy both prongs of the strictness standard. That's Taylor. I think in that case, this is established. The lawyer failed to interview any of the witnesses to the crime. If you're going back to the first prong, though, what I'm really looking at here, counsel, is if you go to Hill, which specifically refers to ineffective investigations. As a matter of fact, let me just read this part because I'm interested in your answer. The Supreme Court says, for example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error prejudiced the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. That's what I'm interested in your response on. We know he didn't investigate, but we also have his testimony that he was very concerned that the officer was going to testify. It was indistinguishable who was doing what. They were all just there in a ball together. The video doesn't show one way or another, but it clearly shows he was in the mix. The counsel was an experienced lawyer. He was concerned by his testimony that his client was going down for life, potentially. And he raised the issue with his client and said, look, you know, he was aware of these affidavits at that point. I mean, they were there, at least not the two that came afterwards, but the ones before. And he said to them, look, this is what you're dealing with. You've got the testimony of the officer. You've got the video. And if it doesn't go your way, you're looking at an indeterminate sentence. I don't think the lawyer was aware that they came after him in a habeas petition. Perhaps so. Yeah. He was not aware of any of that stuff. Okay. He didn't have enough information. And, in fact, with respect to whether he would have pled guilty right before the hearing, right, in the beginning of the day, Carrasco says, and I asked him, can you prove my innocence in this case, in which he replied, yes, he can. And that was based on the videotape evidence alone. And then, of course, he jumped on Bradley's bandwagon and kind of abandoned his client. Now I want to address your question. Your question had to do with what was the State's basis for coming to the conclusion they came to, the facts and the conclusions, which I believe are objectively unreasonable. And I want to specifically mention that right now. The State appellate court found that counsel's performance was constitutionally sufficient because he spoke to Carrasco on four occasions for a few minutes before or after the hearing, because he viewed the videotape, which we know was unintelligible, because he went to the prison yard. I don't know. Because the prison yard was small, how that would have made any difference. And because he talked to him before he pled. The facts that the State court highlighted to support three, Barnhart identified Carrasco as being among the attackers. We know that's not true. Eight times, at least eight times in the record, Barnhart admitted he could not tell who was throwing blows, who was attacking, couldn't make out faces, anything. Number two, Barnhart saw striking motions from each individual attacking the victim. We know from the record, completely unsupported. Number three. I thought that was supported. Barnhart's testimony alone. Counsel, you just said completely unsupported. My recollection was that it was supported. Where do you get the completely unsupported from? Well, Barnhart, at the preliminary hearing, Barnhart got up and he made those statements. Well, you know, they were all involved in the fight. And then through many pages of cross-examination, he was completely impeached. So you're not saying it's completely unsupported. You're saying that his testimony to that effect was, in your opinion, successfully impeached. Completely and successfully impeached on numerous occasions. When you said completely unsupported, that's not what you meant. I'll accept your characterization. Well, if I'm wrong, you educate me. You know the case, counsel, much better than me. Educate me if I'm mistaken. Just show me where it is. I didn't. Barnhart's initial response at the preliminary hearing was completely undermined and impeached by what he said ten times. And I have the cites here if you'd like them. Ten times later, under cross-examination, he pretty much said, admitted, I cannot tell what's going on. I cannot discern faces. I didn't see Carrasco throw any blows. The only two people he identified as being assailants were Moda and Lucero. And the last fact that I just want to get back to this is important, that the state court relied on in its decision. Barnhart's testimony alone would be enough to convict Carrasco. Well, I don't see how that could be at all, given the number of times that he admitted he couldn't tell what was going on. Just to clarify, the state court of appeal did not have before it any of the exonerating affidavits. Is that correct? State court of appeal did, Your Honor. Which there was a contemporaneous petition. And they don't address them. But they don't address them. No. Okay. That's what I thought. I thought they said they were not credible. I would like to clarify one other thing. And you, I think you said, Your Honor, I think you raised this. We, this Court can consider all five exculpatory declarations. The only point that was raised by the State was the fact that in Carrillo's and Calabello's second declaration, they provided an initial declaration, then they provided a second declaration. In that declaration, they said that they were never contacted by Daley. That is the only fact that changed which the district court said we can't hear because it wasn't presented to the state courts. Otherwise, the exculpatory nature of five declarations is intact. Counsel, I keep getting confused by my recollection of the record and your statements about it. You said that the state court, the state appellate court did not address the declarations. And I look at page 34 of their decision, at 47 of the excerpts, and they do. They say that Mace's statement and the declarations of the other assailants and witnesses are not credible. And then you say that Barnhart basically admitted on cross that he could not see that Carrasco was attacking. And I look at page 71 of the preliminary hearing, and he's asked, did you notice if anybody over there wasn't fighting? He'd already identified Carrasco as one of the ones who was over there. And he says, no, everyone was fighting. You're pretty sure of that? I'm pointedly positive they were. You saw them all throwing blows? I saw all arms moving. Did you see any of the blows land? No, I couldn't tell because I couldn't see Mr. Mace anymore. So it looks as though what you've got there is different from what you just told us. Well, I stand corrected on the fact that the State Appellate Court decision actually made what can only be an unsupported statement, that the declarations are incredible or not credible. On what basis could they draw that conclusion, the State Appellate Court, number one? Number two, even the district court looked at the videotape and said it was unintelligible. And even Daley, at the preliminary hearing, based on Barnhart's testimony, stopped the proceedings and said he wanted to take them on voir dire. He said, wait a minute, Mr. Daley. Your testimony is inconsistent with the videotaped image. They were looking at the videotaped image. They don't line up. Even Mr. Daley, his lawyer, acknowledged that at the preliminary hearing. And then the district court also acknowledged it. So I find Barnhart's testimony, or at least those parts in the beginning where he says, well, everybody was involved in the fight. Well, you couldn't tell, could you? But ultimately, as Judge Kleinfeld points out, Mr. Barnhart made certain statements. You think they were impeached, but there was evidence there. You're asking us to review the findings of a lower court, in effect. And the standard, I believe, was clear and convincing evidence, right? Do you agree with that? I think that exists in the record. So basically, you're asking us to make a determination that in reviewing Barnhart's testimony in terms of evaluating the prejudice prong and what Mr. Daley would have done had he been aware of the testimony, potential testimony of these other witnesses, whether he would have so discounted Barnhart's testimony that it would have, in effect, compelled him to recommend that his client go to trial as opposed to cop a plea. Isn't that right? That's correct. But I would like to refer the Court to Miller L., 537 U.S. at 340. This Court can disagree with a state court's credibility determination and conclude its decision was unreasonable. But what standard? What? We can do that, but by what standard? We have to find clear and convincing evidence in order to arrive at that conclusion? And I think that the five exculpatory declarations contribute to the clear and convincing evidence. I think the fact that Barnhart was soundly impeached and admitted eight times, I can refer to each one of those times. Yeah, I think we've got the point. Okay. I think that's critical. I think that it's interesting to note that when the first tear gas canister was discharged, that Carrasco and Holman ran to the other side of the yard completely, whereas Lucera and Mota continued to assault Meza. Okay. I think we're in the realm of now picking over the record. We'll thank you for that additional time. All right. Thank you both. We will stand in adjournment, and Judge Kleinfeld will join us. The two of us afterward, as we confer. So we are not going to wait any further on this case. We'll talk about it when the case is submitted. Thank you. All rise. The case is submitted. Thank you for your support for this session. We stand adjourned.
judges: Kleinfeld, Fisher, M. Smith